Filed 4/29/14  Linda Vista Park, LLC v. Linda Vista, LLC CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LINDA VISTA PARK, LLC, | |
| Plaintiff and Appellant, | G049497 |
| v. | (Super. Ct. No. RIC10000667) |
| LINDA VISTA, LLC, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment and order of the Superior Court of Riverside County, Mac R. Fisher and Craig G. Riemer, Judges.  Affirmed.

Thomas Whitelaw, Joseph E. Thomas and Kerri A. Rich for Plaintiff and Appellant.

Hart, King and Coldren, Robert S. Coldren, C. William Dahlin and Rhonda H. Mehlman for Defendant and Respondent.

\*          \*          \*

# I.  INTRODUCTION

This is a multivolume dispute about how to interpret an option clause in a lease agreement.  A retired Orange County Superior Court judge acting as an appointed referee interpreted the contract to mean the land which was subject to the option – a mobilehome park then being operated as a viable, ongoing mobilehome park – had to be valued *as a mobilehome park*, and not as if the would-be buyer were starting with just naked land and building a mobilehome park from scratch.  The referee thus denied the would-be buyer's attempt to compel specific performance of the sale of the land as if it were in a wholly raw state – sans entitlements, sans permits, sans intangible development costs, sans everything but the bare-naked land itself.  We affirm the judgment embodying that denial.

# II.  FACTS

We begin with the problem of telling the parties apart.  Only one word distinguishes the plaintiff "Linda Vista Park, LLC" from the defendant "Linda Vista, LLC," so there is a strong potential for confusion.  We will therefore mostly refer to Linda Vista *Park* as "the Carnahan group" (after its progenitor, Karubah Carnahan) sometimes as "the Lessee."  We will refer to Linda Vista sans Park mostly as "the Watkins group" (after its progenitor, Ervin Watkins) and sometimes as "the Lessor."

The story begins in the early 1980's, when Watkins bought the Linda Vista Mobilehome Park in Banning.  In 1995, Watkins and Karubah Carnahan entered into a contract which may be safely described as a lease with an option to buy.  In broad terms the contract provides that Carnahan leased the park from Watkins, operated it, and if he chose, had an option to buy it.[1]

---

[1]  Neither Carnahan nor Watkins were available for trial in this case.  Carnahan suffered a stroke in 2008 and is under a conservatorship, and Watkins died in 2004.

The agreement begins by describing Watkins as Lessor and Carnahan as Lessee.[2] The agreement then calls for rent due on the first of each month, to be calculated as the sum of two components: a fixed component and a variable component to take into account inflation. The fixed component is set at $11,000 and is to remain the same for 30 years. The variable component starts at $13,333 and then increases each year as the cost of living goes up. Thus the first year's rent in 1995 was set at $24,333. In no event is the variable component of the rent to decrease.[3] The Lessee is further obligated to pay, after the first year (which involved some proration) all taxes on the property.[4] Similarly, the Lessee is obligated to maintain the existing physical infrastructure (things like curbs, driveways and gutters) plus maintain any new physical infrastructure which he himself puts in.[5]

---

[2] "THIS LEASE, made as of the 1st day of February, 1995, by and between Ervin L. Watkins and Vera K. Watkins, Trustees Under Trust Dated March 20, 1978, as to Parcel A; and Ervin L. Watkins and Vera K. Watkins, Trustees U/D/T March 20, 1978 F/B/O The Watkins Family Trust, as to Parcel B . . . herein referred to as 'Lessor', and Karubah Carnahan . . . herein referred to as 'Lessee.'"

[3] "A. Initial Rental: The sum of Twenty Four Thousand Three Hundred Thirty Three and No/100 Dollars ($24,333.00) per month payable in advance on the first day of each month commencing February 1, 1995 and through and including January 1, 1996. The initial rental shall have two components; first, a 'fixed rental portion' in the sum of $11,000.00 and second a 'variable rental portion' in the sum of $13,333.00.

"B. Adjustment to Initial Rental: Commencing February 1, 1996 and each February 1 thereafter ('adjustment date'), the variable rental portion shall be increased, but in no event decreased, in accordance with the increase, if any, in the cost of living. The initial rental, including the variable rental portion as so adjusted, shall be paid on the adjustment date and on the first day of each month until the next adjustment date.

"The adjustment to the variable rental portion shall be calculated based on the increase in the cost of living shall be determined on each adjustment date by multiplying the sum of $13,333 (i.e. the variable rental portion) by a fraction [based on the] Consumer Price Index . . . ." (Original underlining omitted.)

[4] "With respect to the 1994-1995 tax year and the 2028-2029 tax year, the tax shall be pro-rated between Lessor and Lessee based on the number of months that this Lease is in effect during the tax year. In each other tax year during the term of this lease, Lessee shall pay and discharge all taxes, assessments and other charges against the leased land. . . ."

[5] "6. MAINTENANCE AND REPAIRS. In addition to the other covenants and conditions to be performed by Lessee hereunder as a material part of the consideration for this Lease, Lessee agrees to cause to be maintained and repaired all walks, sewers, drains, curbs, gutters, driveways, streets, structures, facilities and other improvements (hereinafter collectively referred to as 'improvements') which are now included as a part of the leased land, which are located on adjacent land but service the leased land, or which are subsequently constructed on the leased land or such adjacent land servicing the leased land.

"To the extent required by law, ordinance or regulation applicable to the leased land, Lessee shall make or cause to be made any and all additions, alterations and repairs to Improvements which are now included as part of the leased land, which are located on adjacent land but service the leased land, or which are subsequently constructed on the leased land or such adjacent land servicing the leased land.

"Lessee hereby indemnifies and saves Lessor harmless from all actions, claims and damages by reason of Lessee's failure to comply with and perform Lessee's obligations under this Paragraph 6.

The contract is very clear on the *use* of the land. It is to be used *only* as a mobilehome park.[6] It is also clear that the land was *already* being used as a mobilehome park at the time of the inception of the lease, and that the Lessor had *already* obtained the necessary permits and legal entitlements required to be in business as a mobilehome park.[7]

All of which brings us to the option clause, which is the center of this litigation. Essentially – in the aftermath of the death of Watkins and his wife – Carnahan (or in this case, the Carnahan group) has the option to purchase the park, but – in keeping with the way the rent is structured – at a price dependent on both fixed and variable components. The value of the fixed component, denominated in the contract and in the briefs as the "Improvement Component," is (thankfully), not at issue in this case.[8] Accordingly, the parties were able to agree the amount as of December 2009 came to $1,157,247.[9]

---

"All of Lessee's repairs, additions, modifications, alterations, and construction of Improvements on or about the leased land shall conform to all applicable public laws, ordinances, regulations and judicial decisions applicable thereto; and all work in connection therewith shall be prosecuted and completed with reasonable diligence and said work shall be done at the sole cost of Lessee, without any cost or expense to Lessor." Original underlining omitted.)

[6] "5. USE. During the term hereof Lessee shall use and occupy the leased land for the sole purpose of the operation and maintenance of a mobilehome park. Lessee shall not use or permit the leased land or any part thereof to be used for any other purpose except by permission granted in writing by Lessor." (Original underlining omitted.)

[7] "7. PERMITS AND ZONING. Lessor has obtained the necessary use permits required to utilize the leased land as a mobilehome park and the same shall be transferred to Lessee, upon Lessee's payment of all applicable fees and costs. The park is zoned residential, a designation which permits operation of a mobilehome park." (Original underlining omitted.)

[8] The calculation yields a different result depending on the month the property is purchased according to the option clause.

[9] Because it is the center of this appeal, we set out the option paragraph in its entirety:
"9. OPTION TO PURCHASE.
"A. Commencing on the earlier of: (i) January 1, 2025 or (ii) the day following the date of death of the earlier to die as between Ervin L. Watkins and Vera K. Watkins, and continuing through the end of the term of this Lease ('Option Period'), Lessee shall have the right to purchase the leased land at the price ('Option Price') set forth in Paragraph 9B, below, and upon exercise of this option ('Exercise') as set forth in Paragraph 9C, below.
"B. The Initial Option Price shall be the sum of Three Million Five Hundred Thousand Dollars ($3,500,000). The Initial Option Price shall be in effect with respect to a purchase closed on or before December 31, 1995. With respect to a purchase closed after December 31, 1995, the Option Price shall be the sum of two component parts, as follows:

"(1) The first component of the Option Price shall be the 'Improvement Component'.  The Improvement Component shall be determined by starting with the sum of $1,500,000 and subtracting from that sum an amount equal to the principal portion of monthly installment payments on the sum of $1,500,000 at 8% per annum if paid at $11,000 per month for a period equal to the number of full months that have elapsed on the term of this Lease as of the date of the Closing (as hereinafter defined).

"For Example:  If 90 full months have passed before the Closing, the Improvement Component of the Option Price shall be $1,377,225, determined as follows:

$$(\$1,500,000 \times 1.818494) - (\$11,000 \times 122.77404) = \$1,377,225$$

"(2)  The second component of the Option Price shall be the 'Land Component'.  The Land Component shall be determined by 3 MAI [masters of appraisal institute] appraisers as the value of the leased land, without improvements, based on its use as a mobilehome park and determined as of the date of Exercise as follows:

"Within 20 days after the Exercise, Lessor and Lessee shall each select one MAI appraiser with experience in valuing mobilehome parks.

"Within 20 days thereafter the two MAI appraisers selected by the parties shall agree upon a third MAI appraiser and if they fail to do so, either party may petition the Superior Court for the appointment of such a third MAI appraiser.

"The Lessor and the Lessee shall have the right to each submit a single package of information relating to the value of the leased land to each appraiser within 20 days after the appointment of the final appraiser.  Within 45 days after the appointment of the third appraiser, the three appraisers, acting without consultation between each other, shall each fix a value of the Land Component.

"Each appraiser's opinion of value shall be kept confidential until the 'Disclosure Date'.  The Disclosure Date shall be the earlier of the date when each appraiser has fixed a value and notified the others and a date for disclosure within the 45 day period has been agreed upon by the appraisers; or the last business day within the 45 day period after appointment of the third appraiser.

"On the Disclosure Date the appraisers shall simultaneously make a single sealed envelope with their respective opinions of value of the Land Component available to Lessee and Lessor at a single location.

"The Land Component shall be:  the average of the three values IF the lowest value is not less than 95% of the highest value; IF NOT, the two values that are closest shall be averaged to determine the Land Component and the third value shall be disregarded.

"With respect to a closing after December 31, 1995, the Option Price shall be the sum of the Improvement Component and the Land Component determined as set forth above.

"C.  At any time before Noon on the last day of the Option Period, Lessee may Exercise by delivering a written notice to Lessor unequivocally and irrevocably exercising the option and thereafter depositing a copy of this Agreement with Chicago Title Company in Riverside, California (or such other escrow company as is then agreed upon by the parties), ('the Escrow') along with a check in the amount of $10,000.00 as a deposit.

"D.  Escrow shall close on a business day within 180 days after it is opened (the 'Closing') on a date specified by Lessee or on the last day of that period if no date is specified by Lessee.  Lessee shall be required to deposit into escrow, not less than 48 hours prior to the Closing, immediately available funds in addition in an amount equal to the sum of the following:  (1)  the Initial Option Price or the Option Price (whichever is then applicable) less the sum of $10,000; and (2) closing costs and prorations applicable to Lessee.  Closing costs attributable to Lessee shall include one half the amount of the escrow fees, any applicable title charges, and documentary transfer taxes.  (Note:  The Closing shall be equitably extended for the benefit of the other party if one party fails to timely name an appraiser or if the two appraisers are unable to agree on a third appraiser and the Superior Court must select the third appraiser.)

"E.  Within 5 days after receipt of the notice of Exercise referred to in Paragraph 9C, above, Lessor shall deposit into escrow a duly executed and acknowledged grant deed in recordable form in the form attached hereto as Exhibit 'B'.  At the closing, the leased land shall be subject only to items 3 and 4 as shown on schedule B of the Preliminary Title Report attached hereto as Exhibit 'C' and referenced as order No. 578486-08.

"F.  Lessor and Lessee agree to execute the standard form escrow instructions of escrow in connection with this transaction and such other and further documents as may be required to give this Agreement effect.

"G.  Lessor shall deliver good title to the leased land, free and clear of all liens and encumbrances except unpaid taxes not yet delinquent, easements now of record, and other matters of record acceptable to Lessee."  (Original underlining omitted.)

5

And at the center of the option clause, is the variable component, or, to be precise, the *more* variable component, called the "Land Component." There is no dispute the contract provides for an arbitration-like process to arrive at a value for that component. Essentially, the price is to be an average of what three MAI appraisers (one picked by one side, one picked by the other, the third agreed on by the other two) say it is, with a provision to discard any outlier appraiser's value if not within a certain percentage of the others.[10]

But the parties dispute precisely *what* the appraisers are to appraise. The relevant text from the option clause is: "The Land Component shall be determined by 3 MAI appraisers as the value of the leased land, without improvements, based on its use as a mobilehome park and determined as of the date of Exercise . . . ." The Carnahan group interprets the phrase "without improvements" to include not only physical infrastructure, but intangible items such as the cost of obtaining permits and entitlements. The Watkins group believes the phrase still allows for such intangibles as entitlements and permits to be part of the value of the land, and not excluded from it.

---

[10]     "(2)  The second component of the Option Price shall be the 'Land Component'. The Land Component shall be determined by 3 MAI appraisers as the value of the leased land, without improvements, based on its use as a mobilehome park and determined as of the date of Exercise as follows:
    "Within 20 days after the Exercise, Lessor and Lessee shall each select one MAI appraiser with experience in valuing mobilehome parks.
    "Within 20 days thereafter the two MAI appraisers selected by the parties shall agree upon a third MAI appraiser and if they fail to do so, either party may petition the Superior Court for the appointment of such a third MAI appraiser.
    "The Lessor and the Lessee shall have the right to each submit a single package of information relating to the value of the leased land to each appraiser within 20 days after the appointment of the final appraiser. Within 45 days after the appointment of the third appraiser, the three appraisers, acting without consultation between each other, shall each fix a value of the Land Component.
    "Each appraiser's opinion of value shall be kept confidential until the 'Disclosure Date'. The Disclosure Date shall be the earlier of the date when each appraiser has fixed a value and notified the others and a date for disclosure within the 45 day period has been agreed upon by the appraisers; or the last business day within the 45 day period after appointment of the third appraiser.
    "On the Disclosure Date the appraisers shall simultaneously make a single sealed envelope with their respective opinions of value of the Land Component available to Lessee and Lessor at a single location.
    "The Land Component shall be:  the average of the three values IF the lowest value is not less than 95% of the highest value; IF NOT, the two values that are closest shall be averaged to determine the Land Component and the third value shall be disregarded." (Original underlining omitted.)

6

The Carnahan group decided to exercise the option in a letter dated July 16, 2009. By the end of the month the Carnahan group designated its MAI appraiser, John Neet. The Watkins group responded almost immediately thereafter, on July 30, designating its MAI appraiser, Jim Brabant. By the end of September 2009 the two designees had chosen the third appraiser, Clay Harris.

By December, the appraisers had come up with their numbers for the land component. But those numbers varied widely. Neet (Carnahan group's pick) and Harris (the third) came in at $1.23 million and $1.6 million respectively. These were their estimated values of the raw land underlying the park. But Brabant (the Watkins' group's pick) came up with $5.945 million – or, to put it in perspective – a number almost four times what the next highest appraisal was. His figure included in the value of the nontangible land development costs, permits and entitlements. Throwing out Brabant's figure as the outlier resulted in a land component worth $1.415 million. The total option price, given the figures from the appraisal process, excluding Brabant's number, and adding the agreed number from the "Improvement Component" was thus about $2.57 million.[11]

The figure did not satisfy the Watkins group at all. On December 30, 2009, the Watkins group sent a letter to the Carnahan group asserting the option had not been properly exercised. By mid-January litigation was afoot. The Carnahan group filed a complaint for specific performance to compel the sale of the land at the $2.57 million price, and the Watkins group responded with a cross-complaint for, among other things, breach of contract. While the case was originally filed in Riverside County, the parties agreed (we note both sides have attorneys based in Orange County) to have the matter referred to a retired Orange County Superior Court Judge, David H. Brickner as referee.

---

[11] The exact numbers consist of an Improvement Component as of January 2010 of $1,153,962 and $1.415 million land component, equaling $2,568,962.

7

Judge Brickner heard the case in early February 2012. He denied the Carnahan group's request for specific performance, and ruled it had breached the contract, indeed had done so in bad faith by first getting an appraisal from Neet before it exercised the option, something the judge determined to be in violation of the confidentiality provisions of the option clause. What is more, Judge Brickner reformed the contract to make it plainly say – by including the word "physical" in front of improvements – that the land component was to include intangible items of value like permits and entitlements. Judgment pursuant to the referee's decision was soon formally entered by Judge Mac R. Fisher in Riverside Superior Court.

About a month later an attorney fee award was made by referee Brickner in favor of the Watkins group of about $600,000 (half a million in fees, $100,000 in costs). This award was later converted into a formal postjudgment order by Judge Craig R. Riemer in Riverside Superior Court. The Carnahan group filed timely appeals from both the judgment denying it specific performance and the ensuing attorney fee and cost award.

One aspect of the trial testimony requires special recounting before we address the Carnahan group's arguments on appeal. As we have noted, neither Watkins nor Carnahan themselves were available to testify. But the attorney both of them used back in 1995 – Fred Sainick – did testify. The Carnahan group's opening brief describes Sainick as the parties' joint "scrivener." However accurate that description is, by 2012 Sainick had clearly cast his lot with the Carnahan group. He testified the original contracting parties did not want Carnahan to "pay twice for his efforts on the property." However, Sainick admitted at trial that Carnahan and Watkins actually never had a

discussion or agreement in which they agreed that the word "improvements" in the contract would include entitlements.[12]

## III. DISCUSSION

A. *Contract Interpretation*

The central argument presented by the Carnahan group is that Judge Brickner necessarily erred in concluding that the value of the Land Component isn't just raw land, but includes the costs of obtaining permits and entitlements and other soft (nontangible) development costs. For the Carnahan group, whether the word "improvements" is spelled with a small "i" or with a capital "I" makes all the difference in the case. Its theory is that Carnahan did not want to "pay twice for his efforts on the property" if he exercised the option, and so the word "improvements" – small "i" as it appears in the actual option valuation clause – encompasses intangible items like permits and entitlements, and so those items should not be included in the Land Component as part of the option price.

Judge Brickner rejected the interpretation, and so do we. As a matter of the textual exegesis of the lease the case seems clear to us.

We begin with paragraph 6, dealing with maintenance and repairs, for it is here that we actually find the nearest thing the contract has to a specific definition of the word "improvements." There are three references to "improvements" in paragraph 6 – one small "i" and the other two capital "I" – but all three clearly refer to physical hardscape, infrastructural items like curbs and gutters, and not to soft intangible items like permits. Moreover, the references come so close to each other, and so clearly refer

---

[12] This is a fact not mentioned in the opening brief, and is illustrative of why the Watkins group invites us simply to dismiss the Carnahan group's appeal outright for failure to set forth in its opening brief all the material evidence bearing on its appeal. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

We decline the invitation as regards the Carnahan group's appeal from the main judgment, recognizing that appellate courts are inclined to cut appellants a bit of slack on the "all-the-material-evidence" rule when it comes to large records. However, we will enforce the rule anon when we come to the Carnahan group's challenge to the attorney fee and cost award. There, its briefing and record references are so deficient that there is nothing we *can* do but conclude the argument is waived.

to the same sort of items, that it is hard to escape the conclusion – and it certainly didn't escape the trial judge – that the agreement doesn't distinguish between small "i" improvements and capital "I" Improvements at all. The occasional capitalization of the word merely reflects the tendency of many Contract Drafters to overcapitalize Nouns.

The first reference, in fact, is the one to a small "i," and it is here we find an actual definition: ". . . Lessee agrees to cause to be maintained and repaired all *walks, sewers, drains, curbs, gutters, driveways, streets, structures, facilities and other improvements (hereinafter collectively referred to as 'improvements') which are now included as a part of the leased land*, which are *located on* adjacent land but service the leased land, *or which are subsequently constructed* on the leased land or such adjacent land servicing the leased land." (Italics added.)

There is a basic rule of contract interpretation known as *ejusdem generis*. (*Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1045, fn. 4 ["'Where general words follow the enumeration of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to persons or things of the same general nature or class as those specifically enumerated.'"]; accord, *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 743 ["Under the principle of statutory construction known as '*ejusdem generis*,' the general term ordinarily is understood as being '"restricted to those things that are similar to those which are enumerated specifically"'"].)

Here, the rule of ejusdem generis requires that word "improvements," and with a small "i" to boot, refers to physical things like curbs, gutters and driveways. Not a single item in the list preceding the word suggests anything intangible or abstract.[13] In fact, even after the enumerated list of items such as curbs and gutters, the contract

---

[13] The trial judge, as trier of fact, could thus have readily concluded that Sainick's testimony that small "i" improvements were broader than capital "I" improvements was an afterthought, at odds with the actual language of the agreement.

10

confirms the limitation of "improvements" to such physical items by allusions to things that are physically "located on" or "constructed on" the land.

A capital "I" reference to "Improvements" soon follows in paragraph 6, but the context of the reference again unmistakably refers to physical items: "To the extent required by law, ordinance or regulation applicable to the leased land, Lessee shall make or cause to be made any and *all additions, alterations and repairs to Improvements which are now included as part of the leased land,* which are located on adjacent land but service the leased land, or which are *subsequently constructed* on the leased land or such adjacent land servicing the leased land." (Italic added.) Here, the idea of "Improvements" is something which one constructs – one would never use the word "constructs" in connection with a land use entitlement requiring a permit or license – or something *to which* one makes additions, alterations or repairs. Again, nothing intangible. One doesn't repair a license. One repairs a roof.

Then comes the third mention, this one another capital "I" reference. This reference even more strongly differentiates Improvements from entitlements and permits, because the word is used a context which distinguishes it from land use rules: "All of Lessee's repairs, additions, modifications, alterations, and *construction of Improvements on or about the leased land shall conform to all applicable public laws, ordinances, regulations and judicial decisions applicable thereto*; and all work in connection therewith shall be prosecuted and completed with reasonable diligence and said work shall be done at the sole cost of Lessee, without any cost or expense to Lessor." (Italics added.) Nary a thought is given to the possibility that "Improvements" actually *include* permits and entitlements themselves.

Finally, there is the small "i" improvement reference in the option clause itself that is the linchpin of this appeal. Again, the usage indicates that improvements should not include things like permits or entitlements, because those things are integral to the *use* of the land "as a mobilehome park" but are treated as things different from

11

"improvements": "The Land Component shall be determined by 3 MAI appraisers as the value of the leased land, *without improvements, based on its use as a mobilehome park* and determined as of the date of Exercise as follows . . . ." (Italics added.) Not only does this small "i" usage show that improvements and Improvements are interchangeable in the contract, it also establishes that the land, after deduction of "improvements," still must include value for its use *as* a mobilehome park.

The Carnahan group never really proffers a theory of how the phrase "without improvements, based on its use as a mobilehome park" is compatible with the idea of valuation of raw land. If only raw land is meant, the reference to use as a mobilehome park is reduced to surplusage. (See *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1785 [collecting cases illustrating rule against interpretations of contracts that render language surplus].)

Our conclusion is confirmed by the linguistic canon that contracts are to be read as a whole. (E.g., *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.) As we have noted, paragraph 5 plainly limits the use of the park to one *as* a mobilehome park, while paragraph 7 recites that it is the Lessor who has already obtained the permits and entitlements necessary to operate *as* a mobilehome park. Valuing the Land Component without reference to permits and entitlements runs contrary to the confined use of the land contemplated in the agreement.

It is true that paragraph 7 also recites that the permits already obtained by the Lessor "shall be transferred to Lessee, upon Lessee's payment of all applicable fees and costs." But the Carnahan group points to no evidence Carnahan paid anything *separately* for the transfer of permits; all it did vis-à-vis the Lessor was begin paying its lease payments. That's hardly "paying twice" for Carnahan's own efforts. The reasonable inference is that the "applicable fees and costs" being referred to in paragraph 7 are those associated with their transfer qua *transfer*, that is, fees paid *to the agency* issuing the permit for the privilege of having a different person hold title to it, and not

12

paid to Watkins for the presumably more expensive cost of initially obtaining the permit in the first place.

To refer back to the Carnahan's basic complaint for specific performance, the Carnahan group was seeking specific performance of a right it didn't have under the contract in the first place – the right to compel the sale of the property without having to pay for the intangibles that go into its "use as a mobilehome park." The court was thus correct to deny specific performance of that right.

B. *Other Arguments Challenging the Main Judgment*

The Carnahan group raises several additional issues challenging the main judgment, but these are necessarily subsumed in our determination the written contract itself means that neither "improvements" nor "Improvements" include intangible costs. None of the Carnahan group's arguments in regard to these matters logically affect the validity of our determination that the word "improvements" in the option clause does not include the value of permits and entitlements and other soft costs. That said, we briefly address these challenges.

*Reformation*: Part of the judgment was that the option clause has been reformed to now read as follows, with new words in italics: "'The Land Component shall be determined by 3 MAI appraisers as the value of the leased land, without *the physical* improvements *thereon*, based on its use as a mobilehome park and determined as of the date of the exercise . . . .'" (Italics added.)

It is an interesting, but academic, question as to whether there is any meaningful difference between, on the one hand, a court formally reforming a contract to plainly *say* X and not non-X, and, on the other hand, a court merely interpreting the same contract to *mean* X and not non-X. Since the language of the contract here requires an interpretation exactly the same as the one the referee formally reformed it to no prejudicial error inheres present in the formal reformation. The judgment of reformation therefore must be affirmed.

13

We need only add that the Carnahan group's argument that the *effect* of the reformation means the option price exceeds fair market value – and hence presumably *must* be contrary to the putative intent of the parties to allow Carnahan to have the park at below fair market value – is not persuasive. Here, the option clause was clearly and carefully structured by two sophisticated businessmen (as particularly shown by the outlier provision) so that the option formula would yield a price according to variables kept within a relatively narrow range. But as in all option contracts, whether the exercise of the option is a good deal for the would-be buyer or not ultimately depends on the fair market value of the item itself. Put another way, an option deal is a good one if the would-be buyer can turn around and resell on the open market what it has just bought.

The fair market value of this mobilehome park, however, is only loosely connected to the various components which make up the fixed price here. Mobilehome parks, like utilities, are a highly regulated industry. (See *County of Santa Cruz v. Waterhouse* (2005) 127 Cal.App.4th 1483, 1489-1493 [noting intense interest of Legislature to occupy field in Mobilehome Park Act]; accord, *Rubin v. Green* (1993) 4 Cal.4th 1187, 1192, fn. 1 [noting heavy regulation of affairs between park owners and tenants].) The fair market value of a mobilehome park as a going concern depends on any number of items *not* included in the contract formula before us now, such as local rent control, good will among existing tenants, overall land values, the general and local economy, and the perception of favorable or unfavorable political change. The parties knew this and presumably wrote it into their contract.

*Breach of the Covenant of Good Faith and Fair Dealing*: There is confidentiality language in the options clause as regards the process by which the three appraisers arrive at their respective values: "Each appraiser's opinion of value shall be kept confidential until the 'Disclosure Date'. The Disclosure Date shall be the earlier of the date when each appraiser has fixed a value and notified the others and a date for disclosure within the 45 day period has been agreed upon by the appraisers; or the last

14

business day within the 45 day period after appointment of the third appraiser." The referee found that the Carnahan group violated this confidentiality language by obtaining a preliminary appraisal from Neet before invoking the option, hence the finding of violation of the covenant of good faith and fair dealing in the judgment.

As the Carnahan group sees it, the preliminary appraisal obtained from appraiser Neet was mere prudence, given that, as both sides agree, once the option provision is invoked, it cannot be recalled. Textually, the Carnahan group bases its contention on the fact there is no provision in the contract preventing either party from getting an appraisal prior to exercise of the option.

But there is more than the absence of an express prevention of pre-exercise appraisals. There is sequence. When we examine the sequence of the valuation procedure set out in paragraph 9 we find that the contract contemplates exercise of the option *before* the party who exercises the option selects its designated appraiser.

The actual sequence as spelled out in paragraph 9 is determinative. *First*, there is an "Exercise" of the option. (A capital "E" exercise, reflecting again their contract's eccentric capitalization.) *Then*, within 20 days *after* that exercise, each side *selects* one MAI appraiser. After that, within another 20 days, the two selected MAI appraisers pick a third appraiser. Then, each side gets to submit a "single package of information" to all three appraisers. And only then, within 45 days after the submission of the information package, each of the three appraisers "*acting without consultation between each other*," are to "fix a value of the Land Component." (Italics added.) But even then, "[e]ach appraiser's opinion of value shall be kept confidential until the "Disclosure Date." It is only at the Disclosure Date the sealed valuations are opened.

Again we conclude Judge Brickner correctly read the contract. The parties had obviously taken some pains to structure a process in which the appraisers would be acting not only independently of each other, but, at least initially, independently of the parties themselves. From this structure it is pretty obvious that the would-be buyer (the

Lessee) would have a patently unfair advantage over the potential seller (the Lessor) if the buyer were able to *first* select an appraiser, and then, based on that particular appraiser's value, exercise the option *and* designate the same appraiser for the actual appraisal used to calculate the option price.

Here, the trial judge ascertained that appraiser Neet had, in substance, been selected *prior* to the exercise of the option, a finding for which there is substantial evidence in the fact that Neet's preliminary appraisal was identical to his as-a-designated-appraiser appraisal. That pre-exercise selection gave the Carnahan group an unfair advantage, because the Watkins group had only 20 days to designate its appraiser, and, unlike the Carnahan group, had no advantage from any preliminary pre-selection-of-its-appraiser appraisal. The attempt at an unfair advantage, in return, meant the Carnahan group was acting to deprive the Watkins group of the benefit of its side of the contract, here, an appraisal process in which both sides would incur some risk that the ultimate number might not be what they wanted. (See *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 ["In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."].)

*Miscellany*: We need not address whether the referee "correctly" rejected some of the Watkins' groups affirmative defenses, or whether attorney Sainick suffered some sort of conflict of interest. Neither issue affects the judgment being affirmed, and there is no cross-appeal from the Watkins group to require consideration of either issue.

C.  *Attorney Fees and Costs*

A postjudgment order awards the Watkins group about $500,000 in attorney fees and $100,000 in costs (including expert witness costs).  The Carnahan group's main complaint concerns the *amount* of the $500,000 attorney fee award and the concomitant $100,000 cost award; the Carnahan group tacitly concedes it owes something.  (There is, for example, no argument that it somehow was the prevailing party.)

The Carnahan group argues the $600,000 fee and cost award includes work on legal theories that ultimately proved unavailing or unnecessary.  In particular, the Carnahan group posits that the legal work on the theories of (a) Sainick's alleged conflict of interest, (b) that the Carnahan group opened escrow too early in the process of exercising the option, or (c) that Harris had not been designated timely as the third appraiser later on in the process, were all rejected or unnecessary and therefore it is unreasonable to award fees based on that work.  The Carnahan group's challenge also includes challenges to the expert witness costs of two defense experts who critiqued Neet's appraisal.

Preliminarily, we must note that even time spent on unsuccessful legal theories is still compensable in an attorney fee award if the time is *reasonably* spent.  (See *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 273 [observing, in context of private attorney general statute, that "as a practical matter, it is impossible for an attorney to determine before starting work on a potentially meritorious legal theory whether it will or will not be accepted by a court years later following litigation"].)  That principle, of course, merely accords with the actual terms of this particular contract,

which entitles the prevailing party to reasonable fees, as distinct from absolutely necessary fees.[14]

But if the Carnahan group is at all correct in its assertions, there is no way we can tell from its briefing. We thus conclude this *is* an issue that has been waived. (See *People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502-503 [articulating rule that if party fails to support its argument with necessary citations to the record the argument will be deemed waived]; *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we will generally consider only those facts and arguments supported by adequate citations to the record"]; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1140-1141 ["An appellant must support his argument in the briefs by appropriate references to the record, which includes providing exact page citation . . . . 'An appellate court is not required to search the record to determine whether or not [it] supports appellants' claim of error. It is the duty of counsel to refer the reviewing court to the portions of the record which support appellants' position.'"]; *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1560 [because no record reference was "furnished for" a particular statement, court could "ignore it"].)

Here, the very nature of the Carnahan group's argument requires an itemization of the fees challenged as wholly unnecessary and hence presumably unreasonable. Yet the appellant's opening brief asserts that no less than $423,000 of the $500,000 attorney fee award – over 84 percent – is attributable to theories that were not successful. For this arresting proposition it gives us no references and no specifics, merely a conclusory citation to the Carnahan group's own opposition to the Watkin group's request for fees.

---

14      The clause reads: "If any action be commenced to enforce any of the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, court costs and reimbursement for any other expenses incurred in connection therewith."

18

Without more than that, we may dismiss the argument as waived.  The Carnahan group has certainly not carried its burden on appeal of showing some abuse of discretion by pointing out specific evidence to the contrary.

## IV.  DISPOSITION

The judgment is affirmed.  The attorney fee and cost order is affirmed.  The respondent Watkins group shall recover its costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.